No. 3042.

JOHN LANGHAM *v.* THE STATE.

1. THEFT—INDICTMENT—NEW TRIAL.—If in a prosecution for theft under
an indictment which alleges the ownership of the property stolen to be
in some person to the grand jurors unknown, it transpires on trial that
the ownership could have been ascertained by the exercise of reason-
able diligence, it becomes the duty of the trial court, in the event of
conviction, to award a new trial.

2. SAME—NEWLY DISCOVERED EVIDENCE—NEW TRIAL—FACT CASE.—
See the statement of the case for the substance of newly discovered evi-
dence set forth in the motion for new trial *held*, in view of the evidence
adduced on the trial, to have entitled the accused to a new trial.

APPEAL from the District Court of Limestone. Tried below
before the Hon. S. R. Frost.

The conviction in this case was for the theft of a colt, alleged
in the indictment to be the property of some person to the
grand jurors unknown. A term of five years in the penitenti-
ary was the penalty assessed by the verdict.

J. W. Gibbons was the first witness for the State. He testi-
fied that he lived in Freestone county, Texas, just across the
line from Limestone county, and not more than one hundred
yards distant from the said line. The defendant lived in Lime-
stone county, about half a mile distant from the witness's
house. On or about the first day of September, 1888, the de-
fendant came to the witness's house in search of a certain crip-
pled, bald faced bay horse, and asked the witness if he had re-
cently seen that animal. The witness knew that animal as the
Bill Graham bald faced bay horse, and he told the defendant
that he had recently seen it. The defendant then requested the
witness to go with him to hunt that animal. Witness went
with him and they found the Graham horse, in company with
the colt mentioned in the indictment, near Wortham, in Lime-
stone county. The defendant claimed the said colt as his prop-
erty, roped it and took it to the witness's house, in Freestone
county. The witness had seen that colt before, the last time a
few days before the defendant took it. He never saw it any-
where but on the range where the defendant roped it. While

at the witness's house on that evening the defendant trimmed out the colt's tail, and in reply to the question why he did so, propounded by the witness's brother, he said that his purpose was to disfigure the animal. Witness's brother then told the defendant that he had better let the colt go back to its range. The said colt was branded K on the hip, and besides had a blotched brand on the shoulder, which the witness could not decipher. The defendant said that he branded the colt, and that the blotched brand was KI or IK, witness could not now say which. He told the witness that he branded the colt, and that it had previously had his rope on it; and, in reply to witness's question as to where he got the animal, he first said that he bought it for thirty-five dollars, and then that he "hooked" the animal from a fellow who "hooked" it down about Groesbeck, and that he thought he was quite as much entitled to the animal as the other fellow. He did not mention the "other fellow's" name, nor tell witness who he was. The said animal was about two years old when taken by the defendant. The witness had never seen that colt since the defendant penned it at his, witness's, pen on the day above mentioned. The animal was an estray, and the witness did not and never did know to whom it belonged.

The witness went upon the range with the defendant to help him catch another horse. He in no way aided the defendant to rope or steal the colt, notwithstanding it was taken to and penned in his, witness's, lot. The defendant was in the habit of hooking things and then telling witness about it in jokes. Witness's feelings were good toward the defendant, and he was a pretty good friend of the defendant. He and defendant had some hard words once about some money that witness owed defendant, and about which the defendant got after the witness in an angry manner. Whatever of hard feelings was generated by that incident passed away, and defendant afterward visited the witness's house. Witness did not know how long the defendant kept the colt after taking it in the manner stated. Defendant said the blotched brand was KI, or he may have said it was IK. If defendant had a brand witness did not know it. The witness was taken before the grand jury about this case under attachment, and was not voluntarily prosecuting the defendant. He was unable to say whether or not the defendant was joking when he said he "hooked" the colt. The blotched brand and the K brand on the hip of the

colt were comparatively fresh brands, and were peeling off at the time defendant took the animal. The disagreement between witness and defendant mentioned above took place prior to the taking of the colt. The defendant took supper with the witness on the night of the day on which the disagreement occurred.

Mike Sterling testified, for the State, that he lived with and was the half brother of the witness John Gibbons. He and said Gibbons were at work in the field, picking cotton, on the day of the alleged theft. On that day the defendant came to Gibbons's field and asked Gibbons to go with him in search of the Bill Graham horse. Gibbons declined on the plea that he could not leave his cotton picking. Defendant then told Gibbons that he would help him pick cotton to make up lost time, and Gibbons consented to go, and went off with defendant. Just before noon the defendant and Gibbons returned to Gibbons's house, bringing a colt with them, which they placed in Gibbons's lot, where defendant thinned out its tail. Defendant ate dinner with Gibbons on that day. Just after dinner Luther Wright came to Gibbons's house, and he and defendant rode off together, taking the colt with them. Witness observed only one brand on the colt, and that was the letter K on the hip. The said brand was comparatively fresh. Witness asked the defendant where he got the colt, and he replied that he "hooked it—got it on the other side of Sterling's." Luther Wright was picking cotton in Gibbons's field on that day up to the time he left the place with the defendant and the colt. Defendant and John Gibbons were friendly on that day, and, so far as the witness knew, they were still on friendly terms. He knew of no trouble between them. The witness had seen the said colt on the range prior to the day of its alleged theft, but had never seen it since it was taken away from Gibbons's lot by defendant as stated. The color of the colt was what the witness understood to be bay. The witness remembered the occasion on which the defendant and John Gibbons had some rough words with each other about some money. He could not locate the exact date of that occurrence, but it was after the defendant brought the colt to Gibbons's lot and took it away. John Gibbons told the witness that he and defendant had used hard language to each other on a previous occasion.

John Gibbons, recalled for the State, testified that the defendant did not take the Bill Graham horse which they went on the

range to find. When they found the said horse and the colt together the defendant remarked, "There is the colt I bought." He left the Graham horse on the range and took the colt, as before stated. Witness was unable to state whether or not defendant went back to the range and got the Graham horse. The witness had a talk with W. R. Tabor about the defendant taking the colt a few days after the said taking.

W. R. Tabor testified, for the State, that he lived about a mile from the house of the defendant. He did not know when the colt involved in this prosecution was taken, but on one occasion he saw the defendant hunting a colt. At least the defendant said that he was hunting a colt that had recently got away from him for the third time. He said the colt was about two years old, and about the size of a pony. Witness asked him where he got it, and he replied that he traded for it on Richland creek. Witness then went to defendant's field with Seeley and Scruggs, but saw no colt. The witness had never seen a colt branded K in the neighborhood.

Chauncey Smith testified, for the State, that in September, 1888, he saw a two year old bay colt in the defendant's field. It afterwards disappeared, and witness never again saw it. He never saw it before he saw it in the defendant's field. Defendant and another Mr. Langham were then attending the said field together. The witness had known the defendant all of his life, and was familiar with his reputation for honesty in the community of his residence. It was always good. It had never before been impeached, so far as the witness knew. Sell Pursley lived about ten miles distant from the defendant's house, on Pisgah or Richland creek. Witness never saw the defendant at Sell Pursley's house. The defendant was about twenty years old.

The State closed.

Dave Hankins was the first witness for the defense. He testified that he knew the Sell Pursley colt, which was an animal of light brown color, about two years old. The witness heard of the colt in the defendant's neighborhood before the alleged theft of the same, and before the said alleged theft he told the defendant that he, witness, had promised Pursley to get the said colt and take it to him, and at the same time he asked the defendant to take up the said colt and keep it until he, witness, could go to his, defendant's, house and get it for said Pursley. The witness got the said colt from the defendant at his, defend-

ant's, nouse and took it to Pursley. The witness could not now remember the date on which he got the said colt from the defendant. The animal was branded with the letter K on the hip, and if it had any other brand the witness did not know it. Witness lived about three miles distant from the house of the defendant, and about seven miles distant from the house of Sell Pursley. It was the defendant who told the witness about the colt being in his, defendant's, neighborhood, and, as Sell Pursley had told witness to look out for it, he, witness, asked defendant to take it up and keep it until he could go after it. Witness did not think that defendant had taken up the colt when Pursley asked him, witness, to look out for it. Witness took the animal away from defendant's house in the day time— about ten o'clock in the morning. He did not remember where he took dinner on that day, nor when he got to Pursley's house with the colt. Witness charged Sell Pursley nothing for taking the colt to him, nor did he pay the defendant anything for taking up the animal. No person went with witness to Pursley's with the colt. The witness denied that he and one Crouch ever drove a colt from Wortham in the night time. The witness saw the colt for the first time at defendant's house.

Sell Pursley was the next witness for the defense. He testified that he lived in Navarro county, and was the owner of the colt involved in this prosecution. The said animal was a light brown two year old stud colt, branded K on the hip. K is one of the witness's several brands, but was not recorded. He had been using the said brand about a year. The other brands, which belonged to himself and his father, and were recorded, were HZ, T5, and T5 with a half circle above. The colt mentioned in the indictment was the foal of a light brown mare branded T5, which belonged to the witness. The said colt disappeared some time before the first of September, 1888, and witness asked Dave Hankins to look out for it, and if he found it to bring it to him. Hankins afterwards brought the colt to the witness, and he had the said animal at his home at the present time. There was no blotched KI, or other brand than the K, on the said animal. Dave Hankins was not the only person the witness asked to look out for the colt. According to the recollection of the witness, Hankins told him that he had seen the colt, and that it had burrs in its tail. Witness told said Hankins, if he got up the animal, to cut the burrs out of the tail. The tail was trimmed or thinned out when Hankins

brought it to witness's house. Witness paid Hankins nothing for bringing him the colt.

George Wilder testified, for the defense, that he had known the defendant for seventeen years, during which time the defendant's reputation for honesty had been irreproachable. The defendant, in September, 1888, cultivated a field on the old Lindsey place. There was a gate and a public passway through the said field. Witness saw a brown colt in the defendant's said field early in September, 1888.

Marcus Seeley testified, for the defense, that he had known the defendant about fourteen years, and had never known his character for honesty to be assailed until he was charged with this offense. About the time of the alleged theft the witness went to the defendant's field in search of a colt, but found none. The defendant was not at his home at that time. The witness afterwards found a light brown two year old colt, branded K on the left hip, and a mark on the shoulder which he took to be a blotched brand on the shoulder, in the Bennett pasture, which said pasture was in Sell Pursley's neighborhood.

Cross examined, this witness said that he was familiar with the reputation of Sell Pursley and Dave Hankins for truth and veracity, and that it was bad. The Bennett pasture referred to was about ten miles distant from the house of the defendant. Horse thieves were plentiful in the community at the time of this alleged theft, and the good citizens at that time were exercising unusual efforts to detect and punish them. Witness, who was then a deputy sheriff, went into the Bennett pasture to look for stolen property. The K brand was not known in Pursley's neighborhood as Pursley's brand. It was not given by anybody who lived in that neighborhood. The witness did not pretend to know all the brands in the said neighborhood, nor all the brands claimed by the citizens. He inquired, but could not ascertain who gave the K brand.

Tom Bounds testified, for the defense, that he had known the defendant for ten years, during which period his reputation for honesty had been good. He could not say that he knew the reputation of Dave Hankins for truth and veracity, but thought it was considered bad. He knew nothing about the reputation of Sell Pursley.

The defense closed.

Tom Bounds, recalled by the State, testified that it was quite an unusual thing for a stud colt to voluntarily leave the range

upon which its dam remained. When chased, such colts fre-quently became separated from their dams and wandered off.

Green Williams testified, for the State, that he never heard of Sell Pursley or anybody else in the neighborhood giving the K horse brand, until this prosecution was instituted. Witness saw the defendant once looking for a colt for which he said he had traded. He described it as a bay colt, and asked if it was or had been with the witness's horses. Witness had known the defendant about six years, during which period his reputation for honesty had been above reproach.

In his motion for new trial the defendant alleged that if his motion was granted he would, on the new hearing, prove by Crouch and E. Hankins, the father of Dave Hankins, that they heard Sell Pursley, in the store of the said E. Hankins, tell the said Dave Hankins that he had lost a light brown horse colt, branded K on the left hip, and asked the said Dave Hankins to look out for said colt, and if he found it, to bring it to him, the said Pursley; and that by Berry Pursley, the brother of Sell Pursley, he would prove that the said Sell Pursley raised and owned the said colt, and branded the same with the letter K on the left hip.

*Kimbell & Kimbell* filed an able brief and argument for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Appellant was tried and con-victed upon an indictment for the theft of a colt, the property of some person to the grand jurors unknown. At the trial the evidence showed that the colt was the property of one Pursley. There is no effort to show what, if any, diligence was used by the grand jury to discover the owner before finding and return-ing the bill of indictment. "It is a well settled rule that when the grand jury could have ascertained the name of the owner of stolen property by the use of reasonable diligence, it is their duty to do so, and failing in this duty, a new trial should be granted." (Atkinson v. The State, 19 Texas Ct. App., 462, cit-ing 18 Texas Ct. App., 456; 13 Texas Ct. App., 514; 6 Texas Ct. App., 238.)

Sell Pursley testified that he owned the colt; that it got away from the range and he told Dave Hankins to hunt and get it up

for him; that Hankins did bring it back to his, witness's, house and that the colt is now at his place. Hankins testified that he told defendant Langham to take the colt up and keep it until he, witness, could come and get it; that he got the colt from defendant and carried it to Sell Pursley's. Unless both Pursley and Hankins swore falsely, there is no question as to the identity of the animal. Defendant may have lied or joked about his having "hooked" the animal; he proved a good character for honesty.

In the light of this evidence we do not think the conviction should be permitted to stand. In view of it we are clearly of opinion the court should have granted a new trial for the newly discovered evidence.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered December 12, 1888.